The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good afternoon, Counsel, and welcome to the Fourth Circuit. Judge Paul Blum, Judge Rushing, and I are pleased to be hearing argument first in the Bonnie Peltier v. Charter Day School, both the appeal and the cross appeal. Mr. Street, would you please proceed? Thank you, Your Honor, and may it please the Court. Aaron Street on behalf of Charter Day School, Inc. and the other defendants. The Plaintiff's Equal Protection Clause and Title IX claims fail at the threshold without reaching the merits of the uniform policy. Their Equal Protection Clause claim fails because the defendants are not state actors, and their Title IX claim fails because a binding Department of Education regulation reasonably interprets Title IX to permit sex-specific dress codes. This Court should decline Plaintiff's invitation to be the first Court of Appeals to hold that a nonprofit charter school corporation is a state actor, and to be the first Court of any level to strike down a comprehensive school dress code under Title IX. Turning to the Equal Protection Clause, whatever one thinks about the uniform policy, it is not the policy of the state of North Carolina. It was formulated by a private nonprofit corporation with a wholly private board, no state officials on the board, and it is undisputed that the state had no input whatsoever into the content of the uniform policy. Charter Day School, Inc. and the other defendants, therefore, are not state actors. Mr. Street, if you could factor into your analysis, please, the fact that the North Carolina statute designates the school as a public school, and CDS receives 95% of its funding from governmental sources. If you could make that part of your analysis, I think it would be helpful. Certainly, Your Honor, and I think the first important thing to note there is that the North Carolina statute, in the same section that it designates the charter school to be a public school, specifically provides that the charter school will be operated and all of the policies will be formulated by a private nonprofit corporation. So the designation public doesn't make a functional difference here, and in fact, it just makes the case on all fours with the Ninth Circuit's Kavanaugh's decision, which also involved a charter school that was labeled public, run by a private nonprofit corporation. If I could mention here, though, Kavanaugh's and Rendell Baker both dealt with the situation of the employer-employee relationship, and there was no direct imposition on a child in the school of a particular policy, unlike what we have here. Does that make a difference? No, Your Honor, it does not make a difference, because in both of those cases that Your Honor mentioned, the court asked the same two questions that apply here, whether the defendants are executing a traditionally exclusive state function and whether the challenged policy has been compelled by some government regulation. The court asked that same question in Rendell Baker and Kavanaugh's, even though those were employee cases. The questions dealt with the provision of education, and I would mention in the Loggio Di's case from the First Circuit, which we discussed extensively in our second brief, the plaintiffs in that case made the exact same argument that Your Honor referenced. I'm sorry, in the Kavanaugh's case, the plaintiffs made the exact same argument that Your Honor referenced. They said, this is different, it's an employee case, not a student case, and the Supreme Court, the Ninth Circuit in that case said it didn't make a difference. In the Loggio Di's case, that was a student case. That was a student discipline code case, and the First Circuit, in a very thoughtful opinion by Judge Boudin, said that it made no difference to the analysis. The question was still the same, whether the charter was carrying out a traditionally exclusive state function. And coming back to your question about… Counsel, if I could jump in. This is Judge Quattlebaum. Do you contend that CDS and RBA are entitled to government immunity, and if so, how does that play into the state actor issue? We do not contend that, Your Honor. We think that the Court of Appeals that has reached that holding in North Carolina has erred, and I think it's notable that the North Carolina Supreme Court has taken up that decision on review. But whatever way that decision comes out, that does not resolve the very different question of state actor status under federal law. Immunity under state law and state actor status under federal law ask very different questions, and if I could unpack that just for a minute. The question of immunity under state law is whether the state has outsourced or delegated some governmental function. The question for state actor status is whether they have outsourced a traditionally exclusive state function. I think everybody agrees education is not a traditionally exclusive state function. This court has held that. Other circuits have held that. The Supreme Court has held that. But second, the immunity question under state law next asks the question of whether the state intended to delegate some level of its immunity to the private actor by virtue of the fact that it's heavily regulating the government contractor. That's a different question, again, from state actor status under federal law, where the question is not whether there's some generic level of regulation. The question is whether the particular challenged action was compelled by some government regulation. But Mr. Street, don't the cases say we look at the totality of the circumstances and that here the state has delegated part of its constitutional duty to provide a public compulsory education, has delegated that function to the charter school, and that's a traditionally exclusive function to provide compulsory education. So why isn't that state action? Well, let me answer. Let me answer that in two parts, because I think you've touched on two themes of the plaintiff arguments. The first is that they rely very heavily on the concept of delegating a constitutional duty. But we know from Rendell Baker and we know from Kavanagh's and we know from Lodgy obese that that is not the test for private contractors who are involved in the education service. And the reason is because almost all probably all state constitutions say that providing education is a core constitutional function of the state. But nonetheless, in those cases, the courts did not ask whether there had been some constitutional duty delegated. The question was very different. It was whether a traditionally exclusive state function had been delegated. And I think that leads into my second part of it. Yeah. Let me ask you, though, if I could, and I don't mean to cut you off, but I want to focus on this. Is there a distinction that you're drawing here between CDS and RBA? Because RBA is the contractors, you know, of CDS. And you seem to be, and I want to make sure I'm not mischaracterizing your position, but you don't seem to be drawing a distinction between the two. Do you distinguish between the two? And is CDS not more in the state action end of the continuum than RBA? Well, yes, Your Honor, we are drawing a distinction between them, but only to the extent that RBA is further removed from state action than CDS. CDS is a contractor of the state of North Carolina, and RBA is a contractor of a contractor of the state of North Carolina. So they're one step removed. But even CDS, Inc., is just a contractor that has contracted to provide education. Now, getting back to your second part of your question, Your Honor, you said, well, isn't public education traditionally an exclusive function? And, again, Your Honor, I think we have to look back to cabinets, which involved a public school. Let's just say for a minute that I don't accept your employer-employee construct. And the cabinet, well, first of all, isn't binding anyway. But there is a distinction. What I want – charter schools, you know, exist only by grace of the state. They're only there because the state lets them be there and delegates them as core functions of public compulsory education. So how do you get away from that? I mean, I understand RBA completely, your argument on that. But how do you get away from that with CDS? Well, Your Honor, I'm not just invoking cabinets. I'm talking about employee constructs. Sure. And, of course, I'm not just invoking cabinets to suggest this court should blindly follow what the Ninth Circuit did. I'm suggesting that case correctly analyzes these questions. And even though in that case the state had delegated its public function of providing public education, the court said this is a functional question under Supreme Court analysis. The question is not whether the label is public. The question is not whether the state has carved off some amount of its constitutional duty. If that were the case, Rendell Baker would have come out the other way. That was also publicly funded and open to individuals that the state had taken care of in the past. So we think the question is not one of labels. And if it were one of – Go ahead and finish your answer, please. I'm sorry. I have a question when you do. But finish that. I apologize. Sure, Your Honor. To just finish that answer is that the public label that is here in the statute on CDS does not tell us anything about the function that has been delegated. The function is educating children. That's not a traditionally exclusive function. And the public label also doesn't tell us anything about whether the state has regulated to compel this particular challenge to action. And I'll loop back later, but I want to hear your question, Your Honor. I didn't mean to drone on at this point. So before you get past the exclusive traditional function issue, it seems to me important how you describe the function that we're talking about. I mean, Rendell Baker, it seems like, said that education is not the exclusive traditional function. I think that much is pretty clear. But then it also talked about the nature of that school, students who had had such problems that their adjustment situation was that they effectively couldn't be taught in the traditional sense. And so I guess here in our case, do we look at it as public free education or do we look at it maybe more granularly as alternative educational options of public education, which is where charter schools, you know, are, you know, their place is. So I'm just trying to figure out what we're looking at. Is it education? Is it alternative methods of education? Or how do we look at that issue? So I think, Your Honor, you look at the function of what is actually being provided and the function of what is actually being provided. And Rendell Baker, you're correct. That was a subset of essentially special needs children. Here, the function is providing secondary and primary education to all comers. This school is open to everybody. It's publicly funded. So the question is whether providing primary and secondary education is a historically exclusive government function. And I think Kavanagh and Lajeodies correctly answer that question and say, no, of course, providing primary and secondary education to kids who are in the normal school population is not. We've had private schools. We've had homeschooling for time immemorial. But getting to the function question, Your Honor, I think I understand the gist of the questions about the public label here and that this is at least nominally part of the public education system. But I think it's important to drill down a bit into the statute and see what the legislature meant by that public label. Before you do that, though, something that's been bothering me since this began, and maybe you could help me with this. We're talking about gender here. And what if let's change the situation to race. And what if this charter school decided that it could put all of the African-American students, make them sit in the back of the classroom in order to get their education? So they would be discriminating against these students based on their race, not on their gender. Are you saying there would be no state action because these children, because this charter school was allowing this racial discrimination, but it was a charter school and not a public school? That's what I'm having trouble on. You know, gender, sometimes gender bias seems more benign in some respects to some people. But let's make it about race. Could a charter school put the black students in the back of the class and be immune from any action because they are not a state actor? Well, Your Honor, the state action question would be the same. But, no, of course a charter school could not do that because a charter school is governed by its charter with the state. And the state charter says that the charters have to comply with the federal and state constitutions, including the nondiscrimination provisions. And that gets to a very important point, which is that these plaintiffs have options to try to enforce their rights here if they think this policy is discriminatory. They should go to the State Board of Education and say, we think CDS Inc. is violating its charter with the nondiscrimination provisions. And the state could sue for a breach of contract. These plaintiffs also have a pending third-party beneficiary claim under the charter agreement. So they believe that they have some option here. But instead they're coming into federal court and bringing a fee-shifting case against an entity that the state specifically took outside of the public school chain of command and said, quote, operates independently of the existing schools, is exempt from statutes related to the existing schools. And I see I'm out of time on my opening. Okay. Let's see if the other judges have questions before you sit down. Not for me. Okay. Judge Rushing? Okay. Okay. Thank you. Ms. Sherman. Excuse me. Sherwin. Thank you, Your Honor. May it please the court. My name is Galen Sherman for the plaintiffs. Every day, in order to attend their public school, the plaintiffs had to put on a uniform that was designed to convey the message that girls and boys should be treated differently, and specifically that the girls should be treated more gently than boys. Now, although this case requires the application of Title IX and Equal Protection Clause in a novel context, specifically a public school uniform policy that requires girls to wear skirts, it is actually the defendant who is asking this court to break with longstanding legal principles and ignore the record. And that's true in at least three respects. First, they would have this court hold that the skirts requirement, a facially sex-based rule, is not subject to heightened scrutiny simply because it is contained in a dress code, and to uphold that rule, notwithstanding its stated purpose to instill traditional gender roles. Second, they ask the court to hold that Title IX, despite this statute's sweeping language and its intent to eradicate different treatment of boys and girls, contains an implied exception for sex-based dress codes like the CBS uniform. And third, they ask the court to hold that North Carolina's public charter schools are categorically outside the reach of the Constitution, and therefore free to violate students' rights with far-reaching implications for the more than 100,000 students who attend those schools. I'd like to address each of these issues in turn. Mr. Sherman, while you're doing that, it would be helpful for you to analyze this in the context of Rendell Baker and Calvinist. Mr. Street is placing pretty significant reliance on that. And so why are those cases inapposite, if you'd make sure that's part of your presentation? Certainly, Your Honor. The defendants are saying that our analysis would have the court ignore the legislature's will and hinge on just one item, which is whether this is a public school. The defendants are actually hinging their analysis on the fact that this is a private corporation rather than a public corporation. The North Carolina legislature, when it established the charter school system, did not create a shadow public school system for the more than 100,000 students as a sort of a civil rights-free zone. And on the contrary, the legislature was careful to specify that charter schools are required to comply with constitutional and civil rights requirements. Now, with respect to Rendell Baker, it is correct that as Your Honor pointed out, that school was not a school that was designated as a public school. It was a private school, and it was engaged in a narrow set of activities related to education and a narrow slice of the student population. It was not, like the charter schools in North Carolina, open to all comers and designated by law as a public school. But counsel, I think that's a fair distinction and appreciate that. How do you deal with the fact that despite that, it received, I think, more, 99% versus 95% of its funding from the public, that students were referred from the public institutions and that the public school district certified or did something? I may have that term a little bit off with the diplomas. Yeah, I mean, I think there's some factual differences there, but there's some things that are pretty similar. And I'm trying to – I didn't read Rendell Baker necessarily as making the points you're making the basis of its holding. So maybe I misread it, but how do you – there's some differences. There's some similarities. What would you say about that? Your Honor, you're correct that there are some similarities, but the differences here are really determinative. And principally, it is the designation of the school as a public institution, as a public school, that's basically on the state's footing as local public schools under North Carolina law when it comes to this question. In addition, it's the distinction that Judge Keenan pointed out, that this was not a case relating to the provision of education by students. It was an employment case, as was the Kavanaugh case. And in Kavanaugh's, the court was careful to say that an entity may be a state actor for certain purposes and not for others. And in fact, later, the Ninth Circuit did go back in another case in an unpublished decision. This is the NAMPA Classical Academy v. Gosling opinion, and make that distinction, that in that case, it did not concern the provision of public education to students. And the NAMPA Academy case did. So the court is definitely at least recognizing that it is a functional and fact-based analysis, and what the defendants are asking this court to do is hinge its ruling entirely on the fact that this is a private corporation, or they're both private corporations, and that is not what this analysis really is about. So, Your Honor, I can also just, to the low DOD's case in Maine, that case, the distinctions are, and that is the one case that the defendants cite that does concern education, provision of education and education policy. But the Maine statute court situation was entirely different. The history was entirely different. Maine had a long history of contracting out entire school districts of education to private schools, and that is not the case in North Carolina. In North Carolina, the history of the state's first functional function of providing education, public free education to all comers, dates back to at least the 1860s, and there is not the same level of contracting that out. So here you have a different history, you have a different statutory scheme in play. And Ms. Sherwin, when you look at Rendell Baker, the court seems to be emphasizing the private nature of the school. They talk about it as being akin to a government contractor. They said that the private school is a lot like a government contractor that fulfills public infrastructure contracts. And I thought that wasn't really clear in terms of what we're looking at today. So how do you fit that kind of analogy into what we've got at the side today? That's correct, Your Honor. I think that's an important distinction because the nature of the services that were being provided to the student population in Rendell Baker were very specialized. It was, again, a very narrow group of students that were being treated, could not be treated in the regular public school system as a whole. And therefore, the state entered into that contract with the school, with the private school, to provide those specialized services. That's, again, very different than the situation we are looking at here, where Charter Day School is defined as a public school. It is required to accept all comers. And it is situated within, essentially delegated, the authority that lies solely with the state but has been delegated to the charter schools under Article 9, Section 2. Otherwise, the state alone, as a matter of history in North Carolina and as a matter of the statutory school. Counsel, if I could ask two questions, and that's probably unfair, but let me know if I need to repeat anything. But the first one, on the state actor, the same thing I asked your colleague, if you could address the extent to which the governmental immunity issue you believe plays into this. And then the second question I have is, I realize if the answer is yes, it doesn't mean you should lose here. But do you agree with your colleague that you have an avenue for prevailing under a constitutional theory other than a 1983 action, your third-party beneficiary claim? So those are the two questions. I'm sorry to hit you twice. That's fine. I'll take – no problem, Your Honor. I will take the second one first. We do have a third-party beneficiary contract claim that is pending currently under a stay. And it's sort of a belt and suspenders approach. You're arguing those in the alternative. So that does not mean we cannot be here today before this court. Well established that public schools – Yeah, I'm not suggesting otherwise. Yeah. Right. So on the question of immunity, the immunity analysis part has been taken into account in this court's cases, including in the Goldstein Volunteer Fire Department case. That's certainly a factor. And the question that the high court in North Carolina has taken up is really the question of whether the charter schools enjoy sovereign immunity at the same level of the state itself, or whether they enjoy the same level of governmental immunity that is enjoyed by a traditional public school. So whether or not – no matter how the court answers that question, the state action analysis doesn't change. Essentially, the state has delegated its authority and its constitutional obligation to provide free public education. And with that, it has also conferred a certain amount of immunity. It basically placed the charter schools on exactly the same footing with respect to immunity as a traditional public school. And therefore – I'm sorry. Go ahead, please. I didn't mean to interrupt. I was going to say that, therefore, if the policy would violate the Constitution in a traditional public school, it would violate the Constitution at the charter school. Okay. Ms. Schein? That's kind of where I was leading, because Mr. Street gave kind of an unqualified answer to my race hypothetical. He said, well, you know, aside from the gender into the area of race and the kids being forced to sit in the back of the classroom, that would be a violation of the charter. So you couldn't discriminate on race. You can discriminate based on gender and make the girls wear skirts when the boys can't wear skirts, but you can't discriminate based on race. So could you answer that? How do you respond to that? The charter is clear that the school cannot violate – has to comply with the Constitution and civil rights laws. That's one of the provisions of the charter, and that is being specified in the charter school's law. So Mr. Street is incorrect in stating that the charter allows for gender discrimination of the type that is in play in this case. And if I could just get to that point, the merits of the case here. The issue here is that the defendants are attempting to evade the application of heightened scrutiny. And once we have applied heightened scrutiny, it becomes very clear that this first requirement cannot stand. And that is because it is expressed on and intended to perpetuate sex role stereotypes that have been invalidated by the Supreme Court again and again. The court doesn't have to look far to see those stereotypes, although you wouldn't know it from reading the defendant's briefs. Because the school officials, including the school's president, Baker Mitchell, came right out and said it. And those same justifications have been offered by school officials and embraced by the board of directors of CVS. So it's plain that the sole purpose of this requirement, requiring girls to wear skirts, was to signal gender differences to teach children that girls should be treated more gently than boys. And perpetuate gender roles that have been struck down by the Supreme Court again and again and held in fact. So, here it's understandable that they would attempt to evade the application of heightened scrutiny. What they are arguing that there is some threshold showing that must be made in order to demonstrate, in order to trigger heightened scrutiny. That proposition finds no footing in equal protection. There is no such requirement of showing discrimination for the application of heightened scrutiny. And that's because heightened scrutiny is the tool that the courts use in order to determine whether a sex-based classification is discriminatory. So for that reason, this requirement absolutely has no valid justification. The other justifications that are offered are equally invalid. The notion that the fact that a majority of parents approve of the skirts requirement or the uniform policy as it stands. Or that they wanted uniform policy that distinguished between boys and girls. I don't think anybody's contending in this case that parents can surrender the constitutional rights of their children. I don't think Mr. Street's making that case. He's just saying that the school isn't a state actor, so it is free to discriminate. Your Honor, I did read their briefs as making that point that children enjoy less constitutional rights than adults. And that is absolutely not true when it comes to discrimination. So, Your Honor, you're correct in saying that that would be a profound departure from bedrock principles of constitutional rights, right? Could you address the Morales-Santana holding of the Supreme Court in which the Supreme Court very recently said that all sex-based classifications are subject to heightened scrutiny? Yes, Your Honor, that was exactly what the court held. And the court made plain that there are... How does that play in here? I'm sorry, I didn't hear that? How does that play in here? It makes plain that there are no categorical exceptions for dress codes or any other type of sex-based classification. As long as there is a sex-based classification, then the state has the obligation and the heavy burden of coming forward with an adequate justification that shows that the sex classification is substantially related to that purpose. And the charter school in this case has not done that because the justifications they have offered sound in the same type of benign paternalism, but the court has re-validated it again and again. Counsel, assuming we are at the heightened protection analysis, and I'd like you to assume something I know you disagree with, that you look at the dress code as a whole as opposed to the specific aspect of it that your arguments are focused on. But assume we're talking about the dress code as a whole, would you still say that it fails the heightened scrutiny test, or would you say that it does not? If you're looking at the dress code as a whole, it does because of the overtly stereotype-based justifications that are being offered for it. And that applies really to the skirts requirement regardless of any other effects that it may have on male students. And I see that my time is up. Well, let me ask you one question based on what Judge Quattlebaum just asked. So your point is boys aren't wearing skirts here, and they can't wear skirts under the policy, right? That's correct. You're not allowed to wear skirts, even though wearing skirts instills discipline and respect and other things. It apparently only instills that, I guess, in boys when they look at girls, okay, allegedly. But it seems to me that when the Supreme Court was talking in Bostock, it was saying that discrimination against one gender doesn't excuse discrimination against another. So what I'm asking you here is the fact that the boys are being discriminated against, too, because they can't choose their clothing. They've got to wear khaki pants or shorts, and they have to wear their shirts. Your position, if I'm correct then, is that that doesn't excuse the discrimination against the girls. It isn't a wash. As the Supreme Court said in Bostock, Hannah and Bob are both being discriminated against. That's your position, right? That is our position, Your Honor, that that does not allow the chartered baseball to evade liability. In fact, it would double their liability. Okay. Let me see. I think we are now back to Mr. Street. Thank you. Mr. Street? Thank you, Your Honor. And I'd like to circle back to some of the questions that the court just asked my colleague as well as some of the initial questions to try to really focus the argument here on what's at issue. First of all, I think it's very… You need to talk about Title IX, too. Yes, and I'm happy to do that. Let me try to touch briefly on some of the state action questions and then turn to Title IX. So I think, first of all, it's very important to look at the Supreme Court's most recent word on state action, which is Manhattan Community v. Halleck. And there the Supreme Court said that the traditionally and exclusive state functions are, quote, sovereign functions. They are, quote, very few. In previous cases, the court has said that these are things like elections, eminent domain, criminal justice system. Education is not something that is in that category that's uniquely only done by the sovereign. Second, on the governmental immunity set of questions, again, I think we both agree, both myself and Ms. Sherwin agree, that the answer to that question is not just positive one way or the other. But I think it is important that there are courts that have found a private entity to be a government subdivision but nonetheless not a state actor. We cite a Ninth Circuit case in our brief on that. And this court's case in Goldstein, which Ms. Sherwin referred to, is very illuminating on that point. There the court looked at whether the private firefighting company was immune only as an additional factor after it had first determined that firefighting was a traditionally exclusive state activity at the time that the delegation had been made. And the court only reached the immunity question after it made that holding and that it observed that the private firefighting company had incidents of sovereignty, like police power, the ability to literally break down the doors of unconsenting individuals. So we have obviously nothing like that here. Yes. Counsel, I know you want to get to that. But I got some questions on Title IX. So I'm sorry to redirect you. But do you have, obviously the district court applied Chevron deference to the department, the predecessor Department of Education's withdrawal of the appearance code or the appearance factor in the regulations. Is there I'm not really I understand your arguments. But is there a case where Chevron has been applied in a situation like this to the withdrawal of a regulation as opposed to a statement of something else, something more affirmative? And I understand the reasons why you would say it nevertheless applies. But I'm just really trying to zero in. Is there a case like this where the withdrawal has been afforded Chevron deference? Your Honor, I'm not aware of a case that addresses that one way or the other. But the question is whether, of course, the agency is acting pursuant to its delegated authority to interpret the statute. And what you're calling a withdrawal. Excuse me, though, Mr. Street. The big difference, though, in this Title IX is the fact that you don't have to have state action to have a Title IX violation. So if you weren't finished answering Judge Quattlebaum's question, you know, please continue with that. Distinguished for us here, the mere fact that CDS is receiving these funds, if it's engaging. Federal financial assistance, according to the regulations, is extended directly or indirectly through another recipient. So why wouldn't that put both of them on the hook for violating Title IX? If you have more to say about the Chevron deference, please start. Well, I can answer your question very quickly, Your Honor. There's no dispute that CDS, Inc. is subject to Title IX. RBA, we've discussed extensively in our brief how it's a contractor with a recipient. It's not itself a recipient. And so it's not subject. Under the regulation, you look at 3 CFR 1062.i, it talks about an entity whose federal financial assistance is extended directly or through another recipient. Why wouldn't RBA fall into the category or through another recipient? Because the Supreme Court has held that it's not just every entity that receives money from another recipient. That statutory provision has to be interpreted more narrowly to include targeted things for the precise purpose that Congress has allocated the money. So there's no question that we're subject to Title IX. The withdrawal here is more than just a withdrawal. It's not like a withdrawal of a guidance letter that, like, happened in the transgender situation. This is a withdrawal and a repeal of the previous regulation that authorized regulation of sex-specific dress codes. And it's not just a withdrawal. There's a reason that's given for the withdrawal, which is the Education Department's substantive interpretation of the statute to permit sex-specific dress codes. What do you make, counsel, of the 2017 enforcement inquiry that I think we saw in the amicus briefs where there is an inquiry into a dress code by the Department of Education, you know, in the fairly recent history? If that was an unqualified statement that the statute didn't cover dress codes, why would they even be going into that issue? It's very possible that that particular Department of Education official acted outside the authority of that regulation. But I do want to note one thing about that, which is that all of those inquiries upheld the sex-specific dress codes under the unequal burdens test. And so I think that's very important to note. I also think it's important to note that footnote 12 of our brief, our second brief, we note that commentators who are friendly to the plaintiff's position that oppose sex-specific dress codes nonetheless admit that we cannot bring a Title IX claim to enforce against a sex-specific dress code because the Title IX regulation precludes that. Okay. Let me ask you then, Mr. Street. Are you saying that dress codes are wholly exempt from Title IX? Yes, Your Honor. Okay. Dress codes are not reached by Title IX. Let me follow up then. If CDS said that all girls had to wear bikinis so young men could appreciate the women more, are you saying that would be exempt from Title IX, that the girls would have to wear bikinis and there's nothing that could stop CDS from doing that under Title IX? Let me answer that in a few different ways, Your Honor. First of all, the question really gets at whether the regulation is a reasonable interpretation of the statute. And whether it's reasonable has to be judged with reference to the type of dress codes that were extant in the real world. Thank you, Your Honor. I was addressing your question about the extreme hypothetical dress code, and I think that question gets at whether the Education Department's regulation is reasonable. But that question has to be addressed based on dress codes that existed in the real world at the time the Education Department promulgated that regulation. And those dress codes were very much like the dress code at CDS. They were traditional comprehensive dress codes that imposed requirements on both sexes. Now, if at some point in the future you had this sort of insane dress code imposed, I think a lot of things would happen very quickly. First of all, the state would immediately begin enforcement proceedings under its charter because that would violate gender discrimination protections of the Equal Protection Clause because it clearly does impose unequal burdens on women. And probably even more to the point, you would immediately have every parent pulling their child out of that charter school and taking right along with them their state and federal funding. So if the court ever needs to reach that question in the real world, then I think that's how it would play out. But I think, Your Honor, if I could just – of course, if there are any further questions, but otherwise I would just wrap up seeing that my time is over. I would just say that the plaintiff's position would declare open season on traditional charter schools and their volunteer board of directors by inflicting federal fee-shifting litigation against them. And that would thwart the very flexibility and innovation that the North Carolina legislature intended when it set up regulation through a contract, not through federal Section 1983 litigation. Okay. If you could just wind up, Mr. Streep, by answering one question that kind of brings us back to where we began. How is requiring girls to wear skirts in order to promote discipline and chivalry not an impermissible sex stereotype? Sure, Your Honor. And, of course, let me preface that just by saying we don't think the court ever reaches the merits because of the state action and the Title IX regulation. But that being stipulated, the sex stereotyping evidence that the plaintiffs rely upon has several problems. First of all, it almost exclusively rests on a statement by Mr. Mitchell. But Mr. Mitchell is not the decision-maker. The parents implemented this dress code. You can see that at 1756 to 1757 in the record. They designed the dress code. The board of directors is the policymaker with respect to the dress code. They followed the parents' wishes, and the board of directors explained their reasons for it, which had nothing to do with any sort of sex stereotypes. And even with respect to the type of statements that the plaintiffs rely upon, they are really more in the nature of recognizing that there are physical differences between the sexes. And that's something that, of course, Justice Ginsburg told us in United States v. Virginia. They are not stereotypes that are tied—they're not statements that are tied to excluding girls from any activity. That's what the Supreme Court is concerned about, a sentiment that is, boys are like X. Therefore, they cannot go to nursing school. Girls are like X. Therefore, they cannot go to military school. But here, girls are— Yeah, the girls here couldn't play in the playground. They couldn't do—they said they couldn't do soccer. They couldn't do cartwheels. They couldn't play on the equipment unless it was a PE day, that they were excluded from doing these things because they wore skirts. Isn't that a problem? Well, no, Your Honor, for several reasons. First of all, that evidence does not take into account the objective evidence that is in the record with respect to several things. First of all, that this is not just a skirts policy. There's also the option of wearing a skort, which is a skirt, shorts attached underneath the skirt. And there's also the option of wearing leggings. And that mitigates, if not completely eliminates, a lot of the problems that they're talking about with playing on the playground and with respect to how they're distracted in class. But even more fundamentally than that, you have the expert testimony that the girls are not harmed academically by this policy. And, in fact, they're exceeding males in math scores. They're exceeding their peers at traditional public schools across the board. And they're excelling in extracurricular activity. You also have— But that's a correlation. That's not causation because girls have to wear skirts. They're doing better. Aren't you suggesting that there's causation rather than simply correlation there? No, Your Honor. We're suggesting that if this policy were harming girls in the way that the plaintiffs suggest, that they would not be outperforming boys and they would not be outperforming girls at the traditional public schools where this dress code does not exist. And you also have the evidence in the record of the headmaster that observes all the girls on the playground. And she testifies that I've taught at public school and I've taught at CDS, and the girls are just as active at CDS. So all of these things we think are objective testimony that, at the very least, create a fact issue on that question. Judge Keenan, can I ask one more question, please? Yes, please. Counsel, assume that, just hypothetically, that we rule against you on whether dress code, appearance codes are excluded under Title IX. Given Bostic and given Grimm, what's the standard by which we should or a court should determine whether there is a violation of Title IX? Could you articulate the standard you think applies, please? Certainly, Your Honor. And assuming you get past the regulation, of course, then the question would be answered with the comparable burden standard that was applied by the Ninth Circuit in Jesperson and the Hayden Court under Title IX. And our position is that Bostic and Grimm do not do anything to alter that standard whatsoever. Bostic says on its face that it does not have anything to say about whether sex-specific dress codes are permissible. And the Plaintiffs' Counsel in Bostic and its companion case both assured the court that ruling for the LGBT plaintiffs in that case would do nothing to undermine traditional sex-specific dress codes. So that unequal burden case law, which, incidentally, this court adopted in a slightly different context than the Bower case, applies whenever there are comparable but different requirements on males and females. And under that test, as the Jesperson court explained it, the burden is on the plaintiffs to show that any harm or burden that is put on the girls by the dress code is outweighed by any harm or burden that is put on the boys by the dress code. Let me just stop you and try to get one. And I know we're late, and I apologize. And I guess your answer could be neither one of them apply. But both Bostic and Grimm talk about being worse off, discrimination making one worse off. That's the quote in both of those cases. Does that language, worse off, incorporate the unequal burden test or unequal burden factors? I mean, we're using different language. We haven't adopted that. I'm just trying to figure out if you have a view about whether worse, what that means. Because we've got to follow our precedent in the Title IX case that says worse off. And anyway, so if you could just focus on that, and I promise I won't belabor this anymore. Certainly, Your Honor. It says worse off than a similarly situated person of the opposite sex. So given that's the standard and given that Bostic says it doesn't have anything to do with overruling dress codes, yes, we think that's perfectly consistent with the unequal burden standard. Because there's no way to know if girls are worse off than boys unless you look at both sides of the equation and determine how much burden is being placed on boys by this dress code. It's not enough for a girl to just single out one particular aspect of the dress code that concerns her. Otherwise, every single aspect is always going to be different than something on the other side. And so I think Bostic and Grimm, obviously, very consequential holdings for what they stand for. But it's also important that those are total exclusion cases. Grimm is an exclusion case. That individual was prohibited from using the bathroom that he wanted to use. These are dress codes. Excuse me, Mr. Street. Grimm was arguing the discrimination prong of Title IX. He was not arguing the exclusion from participation prong. Well, fair enough, Your Honor. I think both aspects may have been at play there, but I'll certainly defer to Your Honor's reading of that. But the point is that he was worse off than an individual who had a different gender identity. And under Bostic and Grimm, the court has said that is sufficient. But the court also said at the very same time that traditional sex-specific dress codes are not invalidated outside of that particular context. So if there's no further questions, we would ask the court to reverse on equal protection and affirm on Title IX. Okay, thank you. Ms. Sherwin. Thank you, Your Honor. I'd like to touch on three points. First, with respect to state action, coming back to that question. An additional point that I'd like to raise about cabinets. In that case, it was helpful to note that the Arizona Legislature had expressly stated that charter schools were not subject to the requirements of the Arizona Constitution. And here you have the North Carolina Legislature expressly choosing to include charter schools within the ambit of the North Carolina Constitution. So that's another presentation that cabinets is not controlling in this case. With respect to Halleck, also cited by Mr. Street, Halleck acknowledged that state action may lie where the state has outsourced its constitutional obligate, which is exactly what has happened. Finally, the State Act of Analysis does not apply at all to Title IX, right? All that is required in Title IX is federal funds. And Judge Keenan, you are correct that RBA is an incorrect recipient of federal funds. It is not in the same situation as the contractors that have been held not to be recipients. Because in this case, the funds were earmarked for the purposes of educating students. And that is what RBA used them for directly. And it operated and managed them. I think that the controlling case in this case is Grove City College versus Bell, which was essentially saying that when funds are earmarked for the purposes of education, then it does not matter that there's an intermediate. Now turning to the Title IX analysis. The point that Mr. Street is making that the rescission constitute a carve out of Title IX is unsupported in the law, in the purpose of Title IX, and in principles of administrative procedure law. The agency did not report to interpret the statute, but rather was reflecting its enforcement priorities. Counsel, in fairness, I think we have a unique situation. But in the actual document, what they said, they gave two reasons. They first said they interpreted the statute based on the legislative history not to include that. And then they had a secondary reason that was more akin to an enforcement issue. So, I mean, you're looking to, you know, one of the two reasons given, and actually the second reason given. Let me just ask this, because I don't want to believe, I'm not trying to argue with you. I'd asked your colleague the question of whether you, he was familiar with a case like this, whether the withdrawal of a provision was given deference. And I appreciate his candor. His answer was the same as ours was. Do you have a case of a situation like this where we look to what, you know, either the Supreme Court or other persuasive courts have done with a withdrawal like this? And if you, I know you don't have much time, so you can just give me the name of the cases and we'll look at them if there are any. Yes, your honor, there is a case, a Supreme Court case, a farm case, where the court held that the rescission or change in policy, the withdrawal of a regulation was not entitled to deference because there was, it was not the product of reason to decision make. And that was that case. State, what was that case? State farm. Thank you. And in that case, the court held that the agency's withdrawal did not adequately take into account all of the considerations necessary. And it was not, therefore, the sort, the result of reasoned decision making. In this case, the same is true. The agency, if it were going to be carving out an entire area, a swath of behavior codes in public schools. Ms. Sherman, this is Judge Rushing. I think on State Farm, it wasn't necessarily, it's not that the court disapproved of giving deference to a withdrawal. It's that there were decades and decades of reliance on the regulation at issue there. And the court said that the agency couldn't dismiss all of that reliance and change its position without more explanation than was provided. Now, I'm not saying that that's, I'm not saying that that's a reason we shouldn't look at State Farm at all. I just, I don't think that necessarily answers Judge Quattlebaum's question about whether there's a case on point in the sort of withdrawal with very little said, but also very little reliance. Well, Your Honor, this was a break from preexisting interpretation of Title IX. And I think the point here is that if the agency were making such a break with the preexisting interpretation, which in fact had been laid before Congress and Congress had had the opportunity to reject that interpretation, had they disagreed with it and did not do so. You're absolutely right that the agency didn't give us much to go on in what they wrote if they were interpreting, if they didn't give us much of an interpretation. I'd like to talk about Judge Quattlebaum's question that assuming that he gave to Mr. Street, assuming that we get past this deference question and we don't defer, then what do you think should be the analysis, the way that the analysis should proceed under Title IX in light of this, you know, no worse off standard and the case law that we have from Title VII in our circuit? Certainly, Your Honor, the test is were the plaintiffs here treated worse than others? Were they treated worse than others similarly situated? And that has been already articulated by this court in Grimm. And the record shows here that they were treated worse than others similarly situated. The other similarly situated are, of course, the boys who are permitted to wear pants. And the plaintiffs here have shown unique harms that they experienced as a result of being required to wear skirts to school that they themselves did not experience on the days that they were permitted to wear pants. They were, you know, deterred from engaging in physical activity. They were distracted during class. They were subjected to teasing by their peers and monitoring and reprimands by their teacher, all of which are connected to directly the requirement that they wear skirts. And they've also shown the broader harms that flow from being subjected to sex stereotypes in the classroom and the methods that it sends to students that essentially they were worth less than the boys. Their comfort and ability to learn and play freely were less important to administrators than that of the boys. And finally, there is no showing of harm to the boys from the parallel requirements that they wear pants. Sorry to cut you off. And I don't want to make us go on too long. But are you saying that the analysis should be the same as equal protection analysis? Or are you recognizing a difference under Title IX? I think we've said that Title IX is not coextensive with equal protection. But how are you distinguishing the analysis between those two? No, that's correct, Your Honor. It is a different analysis. In Title IX, what is required is a showing that the plaintiffs were treated differently than others similarly situated and that they were harmed by that treatment. And in this case, they have shown that. Under equal protection, all they need to show is that there is a sex-based classification, which the skirt requirement plainly says. And that sex-based classification is not adequately justified by the government. And in this case, the charter school has not come forward with a justification that is exceedingly persuasive. What they have come forward with is a justification that is premised on the notion that women and girls are weaker and more in need of protection than boys. And that justification has been invalidated again and again by the Supreme Court and by this court. So, Ms. Sherwin, just to follow up on that, I think you said – maybe I misheard this – but I think you said all you need to show is they are treated different and they were harmed. And maybe the harmed is incorporating my question, but I think the language is that they were treated worse off and that they experienced harm. So whereas Title – equal protection would focus on just different treatment, there is, it seems to be, a worse-off treatment. And I think there's a, you know, debate that you have with your colleague about whether worse off includes the dress code as a whole or just a certain aspect of it that y'all have argued very well both ways. But do you agree with me that it's not just the difference, it's that you are – a difference that makes you worse off and that you experienced harm? Your Honor, in Grimm, this court said that it is treated worse than others who are similarly situated and that it caused harm. So that is the test that this court applies, and that test is adequately met here by the showing of harm that's specific to this court's requirement and the lack of any parallel showing on the part of the defendants. And it would be the defendant's burden to come forward with any showing, not the plaintiff's burden to disprove, to prove a negative, right, lack of harm to boys. Because the plaintiffs don't have to prove lack of harm to boys. What they have to show is that they were harmed by this court's requirement and that did not – that there was parallel harm here that flowed to them. And they have done that. So as Judge Keenan articulated correctly, the fact that there are parallel harms to boys here does not negate the very real concrete and dignitary harms that the plaintiffs have suffered in this case and the fact that those interfered with their educational opportunities. Okay. Thank you, Ms. Sherman. My computer situation, I don't – I lost track of the clock and I don't know if you got about equal time. Do you feel like you got about equal time? Yes, if I could just take one more second to sum up. Okay, go ahead, please. Thank you. The relief the plaintiffs receive is not the abolition of the uniform policy as a whole. That's why they are not tackling the uniform policy as a whole. They are not trying to take away the option for other girls to wear skirts. They merely want the choice to wear pants. So in other words, what this court – in the words of Judge Keenan, to refuse to perpetuate the prejudices of the past. And for that reason, the court's direct entry of summary judgment to the plaintiffs on both means against all defendants. Thank you. Thank you both. And, counsel, thank you very much for your very informative participation. You both did a great job and we appreciate your help in putting forth all of the arguments in this case.  Thank you, Your Honor.
judges: Barbara Milano Keenan, A. Marvin Quattlebaum Jr., Allison J. Rushing